UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
OCALA DIVISION

JERYL C. LYNCH,

                    Plaintiff,

v.                                                          Case No.  5:07-cv-266-Oc-GRJ

MICHAEL J. ASTRUE, Commissioner of Social
Security,

                    Defendant.

_____/

## ORDER

Plaintiff appeals from a final decision of the Commissioner of Social Security
("the Commissioner") denying her applications for a period of disability and disability
insurance benefits. (Doc. 1.) The Commissioner has answered (Doc. 4), and both
parties have filed briefs outlining their respective positions. (Docs. 9 & 10.)  For the
reasons discussed below, the Commissioner's decision is due to be **AFFIRMED.**

## I.  PROCEDURAL HISTORY

On August 14, 2002, Plaintiff filed applications for a period of disability, disability
insurance benefits and supplemental security income, alleging a disability onset date of
October 10, 2001. (R. 58-60, 358-60.)  Plaintiff's applications were denied initially and
upon reconsideration. (R. 21-21C, 31-32, 34-35.)   Thereafter, Plaintiff timely pursued
her administrative remedies available before the Commissioner and requested a
hearing before an Administrative Law Judge ("ALJ") (R. 26.) The ALJ conducted
Plaintiff's administrative hearing on October 13, 2004. (R. 410-44.)  The ALJ issued a
decision unfavorable to Plaintiff on November 3, 2006. (R. 9-16.)  The Appeals Council

denied Plaintiff's request for review of the hearing decision.  (R. 3-5.)  Plaintiff then

appealed to this Court. (Doc. 1.)

## II. STANDARD OF REVIEW

The Commissioner's findings of fact are conclusive if supported by substantial

evidence.[1] Substantial evidence is more than a scintilla, i.e., the evidence must do

more than merely create a suspicion of the existence of a fact, and must include such

relevant evidence as a reasonable person would accept as adequate to support the

conclusion.[2]

Where the Commissioner's decision is supported by substantial evidence, the

district court will affirm, even if the reviewer would have reached a contrary result as

finder of fact, and even if the reviewer finds that the evidence preponderates against the

Commissioner's decision.[3] The district court must view the evidence as a whole, taking

into account evidence favorable as well as unfavorable to the decision.[4] However, the

district court will reverse the Commissioner's decision on plenary review if the decision

applies incorrect law, or if the decision fails to provide the district court with sufficient

---

[1] See 42 U.S.C. § 405(g).

[2] Foote v. Chater, 67 F.3d 1553, 1560 (11th Cir. 1995) (citing Walden v. Schweiker, 672 F.2d 835, 838 (11th Cir. 1982) and Richardson v. Perales, 402 U.S. 389, 401, 91 S. Ct. 1420, 28 L. Ed. 2d 842 (1971)); accord, Edwards v. Sullivan, 937 F.2d 580, 584 n.3 (11th Cir. 1991).

[3] Edwards, 937 F.2d at 584 n.3; Barnes v. Sullivan, 932 F.2d 1356, 1358 (11th Cir. 1991).

[4] Foote, 67 F.3d at 1560; accord, Lowery v. Sullivan, 979 F.2d 835, 837 (11th Cir. 1992) (holding that the court must scrutinize the entire record to determine reasonableness of factual findings); Parker v. Bowen, 793 F.2d 1177 (11th Cir. 1986) (finding that the court also must consider evidence detracting from evidence on which the Commissioner relied).

reasoning to determine that the Commissioner properly applied the law.[5]   The law defines disability as the inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment that can be expected to result in death, or has lasted or can be expected to last for a continuous period of not less than twelve months.[6] The impairment must be severe, making Plaintiff unable to do her previous work, or any other substantial gainful activity which exists in the national economy.[7]

The ALJ must follow five steps in evaluating a claim of disability.[8] First, if a claimant is working at a substantial gainful activity, she is not disabled.[9] Second, if a claimant does not have any impairment or combination of impairments which significantly limit her physical or mental ability to do basic work activities, then she does not have a severe impairment and is not disabled.[10] Third, if a claimant's impairments meet or equal an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1, she is disabled.[11] Fourth, if a claimant's impairments do not prevent her from doing past

---

[5] Keeton v. Dep't Health and Human Servs., 21 F.3d 1064, 1066 (11th Cir. 1994).

[6] 42 U.S.C. §§ 416(i), 423(d)(1); 20 C.F.R. § 404.1505.

[7] 42 U.S.C. § 423(d)(2); 20 C.F.R. §§ 404.1505-404.1511.

[8] 20 C.F.R. §§ 404.1520, 416.920. The claimant has the burden of proving the existence of a disability as defined by the Social Security Act. See Carnes v. Sullivan, 936 F.2d 1215, 1218 (11th Cir. 1991).

[9] 20 C.F.R. § 404.1520(b).

[10] 20 C.F.R. § 404.1520(c).

[11] 20 C.F.R. § 404.1520(d).

relevant work, she is not disabled.[12] Fifth, if a claimant's impairments (considering her RFC, age, education, and past work) prevent her from doing other work that exists in the national economy, then she is disabled.[13]

The burden of proof regarding the plaintiff's inability to perform past relevant work initially lies with the plaintiff.[14] The burden then temporarily shifts to the Commissioner to demonstrate that "other work" which the claimant can perform currently exists in the national economy.[15] The Commissioner may satisfy this burden by pointing to the grids for a conclusive determination that a claimant is disabled or not disabled.[16]

However, the ALJ should not exclusively rely on the grids when the claimant has a non-exertional impairment which significantly limits his or her basic work skills or when the claimant cannot perform a full range of employment at the appropriate level of exertion.[17] In a situation where both exertional and non-exertional impairments are

---

[12] 20 C.F.R. § 404.1520(e).

[13] 20 C.F.R. § 404.1520(f).

[14] Walker v. Bowen, 826 F.2d 996, 1002 (11th Cir. 1987). See also Doughty v. Apfel, 245 F.3d 1274, 1278 (11th Cir. 2001).

[15] Doughty at 1278 n.2 ("In practice, the burden temporarily shifts at step five to the Commissioner. The Commissioner must produce evidence that there is other work available in significant numbers in the national economy that the claimant has the capacity to perform. In order to be considered disabled, the claimant must then prove that he is unable to perform the jobs that the Commissioner lists. The temporary shifting of the burden to the Commissioner was initiated by the courts, and is not specifically provided for in the statutes or regulations.") (*internal citations omitted*).

[16] Walker at 1002 ("[T]he grids may come into play once the burden has shifted to the Commissioner to show that the claimant can perform other work.")

[17] Phillips v. Barnhart, 357 F. 3d 1232, 1243 (11th Cir. 2004); Wolfe v. Chater, 86 F.3d 1072, 1077 (11th Cir. 1996); Jones v. Apfel, 190 F.3d 1224, 1229 (11th Cir. 1999); Walker at 1003 ("the grids may be used only when each variable on the appropriate grid accurately describes the claimant's situation").

found, the ALJ is obligated to make specific findings as to whether they preclude a wide range of employment.[18]

The ALJ may use the grids as a framework to evaluate vocational factors so long as he introduces independent evidence of the existence of jobs in the national economy that the claimant can perform.[19] Such independent evidence may be introduced by a vocational expert's testimony, but this is not the exclusive means of introducing such evidence.[20] Only after the Commissioner meets this burden does the burden shift back to the claimant to show that he or she is not capable of performing the "other work" as set forth by the Commissioner.[21]

## III. <u>SUMMARY OF THE RECORD EVIDENCE</u>

At the time of the hearing, Plaintiff was fifty four (54) years old.  (R. 442.)  She has a high school education and took some classes at a tech school. (<u>Id</u>.)  Plaintiff  has previous work experience as an assignment and terminations clerk, secretary, and clerk. (R. 73, 443.) Plaintiff contends that she has been unable to work since October 10, 2001 due to leg, back, hip, neck, knee and foot pain, high blood pressure and depression. (R. 62, 85, 444-45.)

Plaintiff was treated at the Wilcox/Guthrie Army Health Clinic for a number of conditions, including hypothyroidism, hypertension, perimneopause, obesity, hyperlipidemia, osteoarthritis of the hips and diabetes.  (R. 116-212.)  On March 6,

---

[18] <u>Walker</u> at 1003.

[19] <u>Wolfe</u> at 1077-78.

[20] <u>See</u> <u>id</u>.

[21] <u>See</u> <u>Doughty</u> at 1278 n.2.

2001, Plaintiff was diagnosed with type 2 diabetes and hypercholestolemia.  (R. 178-178A.)  Plaintiff was started on Metformin and directed to meet with a dietician for her diabetes and prescribed Zocor to control her cholesterol.  (R. 166.) On April 6, 2001, when Plaintiff was seen for a follow-up appointment, she was off of Metformin as a result of a March 24, 2001 visit to the emergency room due to complaints of fatigue. (<u>Id</u>.)  The physician at the Clinic recommended that Plaintiff continue trying to control her diabetes through diet and exercise and that she follow up in two months to review her blood sugar log and progress to weight loss goals and make a decision whether she should reinitiate oral medication. (<u>Id.</u>)

Plaintiff was referred for trial cervical traction and TENS unit and complained of constant neck and left arm pain.  (R. 126.) On April 19, 2002, Plaintiff reported her neck was much improved and she no longer had pain into the left hand and arm.  (R. 124.) On April 29, 2002, Plaintiff stated she was doing pretty well and that her neck was much improved.  She said traction had helped even though it was painful.  (R. 121.) .

From January 6, 2003 through April 25, 2005, Plaintiff was seen at Marion Heart Associates, P.A. (R. 283-340.)   On April 25, 2003, an x-ray of the right foot showed hallux valgus and an impaction injury of the fifth toe.  (R. 286.)

On September 22, 2003, Plaintiff was seen by Alfredo L. Jacome, M.D., a neurologist, for a neurological consultation. (R. 376-77.)   Dr. Jacome's impression was rule out cervical bulging disc; secondary left upper extremity radicular symptoms; and secondary cervical dystonia. (R. 376-77.)  A September 30, 2003 MRI of the cervical spine showed left paracentral C5-6 and C6-7 bulging discs.   (R. 378.)

From December 1, 2003 to March 5, 2004, Plaintiff was treated at Kessler Rehabilitation Centers for pain in her back, right knee, hip, hand and foot.  (R. 227-56)  On March 3, 2004, Plaintiff reported that her knee was much better, but her hip was still bothering her and she was awaiting approval for treatment.  (R. 228.)

On December 9, 2003 Plaintiff was seen by Joseph A. Tonner, M.D. for evaluation of snoring and possible sleep disordered breathing.  (R. 213-15.)  Polysomnography on February 2, 2004 showed moderate obstructive hypopnea but that Plaintiff did not meet criteria for a split-night study and there was no limb movement, seizure activity or arrhythmia.  (R. 217-18.)

On January 16, 2004, Plaintiff was seen by Michael K. Riley, M.D. an orthopaedic surgeon for complaints of right knee pain.  (R. 273.)   Dr. Riley's assessment was knee pain, osteoarthritis and possible meniscal tear.  (Id.)  Plaintiff was given a corticosteroid injection and it was recommended that she start physical therapy.  Plaintiff returned on February 20, 2004, with continued complaints of knee pain as well as right lateral hip pain.  (R. 272.)         Dr. Riley prescribed physical therapy and Vioxx. (Id.)  On April 12, 2004, Dr. Riley discussed arthroscopic surgery of the knee and Plaintiff said she would consider it.  (R. 271.)

On February 26, 2004, Plaintiff returned for follow up with Dr. Jacome, who noted that although physical therapy had helped with Plaintiff's range of motion she was still having dystonia and radicular symptoms.  (R. 375.)

On May 27, 2004, Plaintiff was seen by Edward L. Demmi, M.D. for an evaluation on the referral of the Office Of Disability Determinations.  (R. 257-62.)  Plaintiff complained of thyroid disease, diabetes, chronic low back pain, severe arthritis in the

right lower extremity, and chronic left arm and wrist pain with numbness.  (R. 257.)

Plaintiff reported that she was diagnosed with diabetes five or six years earlier, and

although she has tried to control her diabetes with diet at times, she has not checked

her blood sugars in two years.  (Id.)  Plaintiff stated that her chronic back pain was

gradually getting worse and her arthritis medications did not seem to help "much any

more." (R. 258.)  As for arthritis, Plaintiff reported that her right hip was worst, followed

by her neck, left wrist, right knee and right foot.  (Id.)  Plaintiff reported that she has

worsening pain and numbness in her left arm and wrist and that she stopped working in

2001 as a secretary because she could not feel her hands due to worsening numbness.

 (Id.) Plaintiff's range of motion in the cervical and lumbar spines was decreased, but no

muscle spasm was noted and Plaintiff's straight and seated leg raises were normal.  (R.

261.)  Plaintiff could walk without an assistive device but she had a small limp on the left

side, favoring the hip.  (Id.)  Plaintiff's grip strength was 5/5 in the right hand and 4/5 in

the left hand.  (R. 262)  Fine manipulations were normal.  Plaintiff's left hand and right

hip had motor strength at 4/5.  (Id.)  There was no reproducible fatigue on repetitive

testing. (Id.)

On July 13, 2004, Dr. Jacome noted that Plaintiff had not responded to multiple

conservative treatments, including Skelaxin, Vioxx, physical therapy and heating pads,

but that she did a little better with Flexeril.  (R. 374.)  Plaintiff reported persistent cramps

and spasms in the lower extremities and mild ataxia.  The findings from a nerve

conduction study on July 15, 2004 were compatible with a sensory motor

polyneuropathy and they did not exclude the presence of an underlying lumbar motor

neuronopathy.  (R. 369.)

On July 20, 2004, Plaintiff was seen by Stephen A. Bookbinder, M.D., a rheumatologist.  (R. 354-55.)  Plaintiff reported persistent pain around the left trapezius area, some numbness intermittently in the second and third digits of both hands, worse when she is typing, driving a car, or talking on the phone.  (R. 354-55.)  Dr. Bookbinder's overall impression was osteoarthritis, cervical spondylosis, possible carpal tunnel, and likely fibromyalgia.  (R. 354.)  An x-ray of the right knee on July 20, 2004 showed marginal osteophyte formation fo the right medial tibial plateau, mild to moderate joint space narrowing and an x-ray of the right hip showed stage II degenerative change with early buttressing of the femoral neck, joint space narrowing and sclerosis and marginal osteophyte formation fo the right acetabulum.  (R. 353.)  On September 8, 2004, Dr. Bookbinder noted that Plaintiff was "making some progress." He noted that her major complaint was weightbearing pain in her hip that radiates into her knee.  (R. 352.)  His overall impression was mild cervical spondylosis, fibromyalgia with depression, and osteoarthritis of the hip, moderately severe.  (Id.)

On September 16, 2004, Plaintiff was admitted to Ocala Regional Medical Center with complaints of dizziness, nausea and headache.  (R. 395-98.)  Plaintiff was treated and discharged the same day.  (Id.)

On October 20, 2004, Dr. Bookbinder noted that Plaintiff "seems to be improving" but noted some interruption of her sleep pattern and increased her dosage of Trazodone.  (R. 349.)  He noted that ultracet was working well for radicular pain.  (Id.)

On November 23, 2004, Dr. Bookbinder completed both mental and physical Medical Source Statements of Ability To Do Work-Related Activities.  (R. 343-48.)  With respect to mental Source Statement, Dr. Bookbinder opined that Plaintiff had fair ability

to remember locations and work-like procedures; carry out short, simple instructions; maintain attention and concentration for extended periods; perform activities within a schedule, maintain regular attendance and be punctual; sustain an ordinary routine without special supervision; work with or near others without being distracted by them; make simple work-related decisions; interact appropriately with the public; ask simple questions or request assistance; accept instructions and respond appropriately to criticism from supervisors; get along with co-worker and peers; maintain socially appropriate behavior; adhere to basic standards of neatness and cleanliness; respond appropriately to changes in the work settings; travel in unfamiliar places or use public transportation; and set realistic goals or make plans independently of others.   He further found that she had poor ability to complete a normal workday or workweek and perform at a consistent pace and good ability to beware of normal hazards and take appropriate precautions.

Turning to the Physical Source Statement, Dr. Bookbinder opined that Plaintiff could frequently and occasionally lift less than 10 pounds; stand and/or walk less than 2 hours in an 8-hour workday; and she must periodically alternate sitting and standing to relieve pain and or discomfort.  (R. 345-46.)  Dr. Bookbinder found that Plaintiff was limited in her ability to push and pull in the upper extremities due to her cervical spine and upper extremities.   He opined that Plaintiff should never climb, kneel or crouch, and only occasionally balance and crawl.   He further found that Plaintiff was limited in reaching in all directions, handling, fingering and feeling and that she should be limited in her exposure to temperature extremes, noise, dust, vibration, humidity/wetness, hazard and fumes.  With respect to fibromyalgia, Dr. Bookbinder opined that Plaintiff

has severe pain all over, fatigue, disturbed sleep, stiffness and tender points.  (R. 348.)
He further noted that Plaintiff had 15 of the 18 tender spots.

On January 6, 2005, Dr. Jacome noted that her neuropathic symptoms had partly
responded to a very low dose of Neurontin and that she had significant limitation in her
left cervical lateral rotation.  (R. 367.)

On January 21, 2005, Plaintiff returned to Dr. Bookbinder and reported
intermittent pain in her right hip and overlapping radicular pain.  (R. 358.)  She reported
that medications were helping her pain.  (Id.)

On February 3, 2005, Dr. Jacome noted that conservative treatments had failed
and he administered botox therapy.  (R. 365.)  On March 9, 2005, Dr. Jacome
completed a Medical Source Statement Of Ability To Do Work Related Activities. (R.
360-62.)  Dr. Jacome opined that Plaintiff could occasionally and frequently lift 10
pounds; stand and/or walk at least 2 hours in an 8-hour workday; and sit about 6 hours
in an 8-hour workday.  (R. 361.)  He further opined that Plaintiff's pushing and/or pulling
was limited in the upper extremities; she could only occasionally balance, kneel and
crawl; and never climb or crouch.  (Id.)  He further found that she could not reach over
her head.  (R. 362.)

On May 10, 2005, Dr. Jacome noted that Plaintiff's examination was unchanged
and that botox therapy had failed.  (R. 364.)  He ordered an MRI of the cervical and
lumbar spine.

On May 12, 2005, Plaintiff saw John R. Heiser, DPM, for evaluation of an old
right foot injury.  (R. 399-401.)  Plaintiff complained of recent sharp and shooting pains
in the right foot and Dr. Heiser recommended orthotics and ice.  (Id.)

11

On May 28, 2005, Plaintiff had MRIs of the cervical and lumbosacral spine.  (R. 402-04.)  The MRI of the cervical spine showed at C5-C6, a right lateral disc protrusion superimposed over an annular bulge attributed to right-sided neural foraminal narrowing and broad based posterior protrusion at C6-C7 causing no central canal stenosis, however, bilateral neural foraminal narrowing was seen.  (R. 387-88.)   The MRI of the lumbosacral spine showed circumferential annular bulge and ligaments and facet hypertrophy at the L4-L5 level contributing to bilateral neural foraminal narrowing, right greater than left.  (R. 388-89.)

On May 18, 2005, Plaintiff was seen by Paul D. Jo, M.D. for hematuria.  (R. 407.)  However, on June 20, 2005, Dr. Jo's impression was Hematuria negative work-up and concluded that a urinary tract infection was the likely cause.  (R. 406.)

On November 2, 2005, Plaintiff was seen by Jay R. Rubin, M.D. for a neurological consultation.  (R. 427-30.)  Dr. Rubin diagnosed Plaintiff with chronic sacral pain that was more likely associated with right sciatica and piriformis muscle syndrome than lumbosacral disc disease; chronic neck pain with decreased range of motion associated with degenerative arthritis; moderate degenerative changes and disc disease of her cervical and lumbar spine; chronic musculoskeltal pains; and frustration and depression associated with chronic pain.  (R. 429.)   Dr. Rubin recommended physical therapy and refilled her prescription for Neurontin.  (R. 429-30.)   In follow-up appointments, Plaintiff reported that her lower back, hip and neck pain had improved with physical therapy.  (R. 424-26.)

On November 3, 2005, Plaintiff returned to Dr. Bookbinder and reported that she was still having a little difficulty sleeping, but trazodone has helped her a lot.  (R. 423.)

12

Dr. Bookbinder noted that Plaintiff still had a few minor trigger points and that Zanaflex had really helped nocturnal leg cramps. (R. 423.)

On February 16, 2006, Plaintiff once again saw Dr. Bookbinder and complained of diffuse pain in her right hand and some pain in her shoulder.  (R. 422.)  Dr. Bookbinder noted that MRIs showed some osteoarthritis in her neck and areas of possible nerve root compression.  He switched her from Neurontin to Lyrica presuming most of Plaintiff's pain was neuropathic or caused by fibromyalgia.[22]

There are two Physical Residual Functional Capacity Assessments performed by non-examining state agency physicians – Nicholas H. Bancks, M.D. on June 29, 2004 and Eric C. Puestow, M.D. on October 7, 2004.  (R. 263-70, 274-82.)  Both physicians found that Plaintiff could frequently lift ten pounds and occasionally lift twenty pounds; and stand and/or walk and sit about six hours in an 8-hour workday.  (R. 264, 275.) They also found that while Plaintiff was limited in her ability to push and/or pull in her left upper extremity, she could push and/pull in her lower extremities without limitation.  (Id.) Both physicians found that plaintiff was limited to occasional climbing, balancing, stooping, kneeling, crouching and crawling (R. 265, 276) and Bancks further found hat she should avoid concentrated exposure to extreme cold, extreme heat, vibration and hazards.  (R. 267.)

At the hearing on July 19, 2006, Plaintiff testified that she is able to do limited cooking and household cleaning and that her husband helps her with bathing and

---

[22] At the hearing, Plaintiff's counsel represented that he had faxed some additional records which were not in the record at the time of the administrative hearing – i.e. a June 22, 2006 progress note from Dr. Bookbinder and blood work results showing a SED rate and rheumatoid factor.  (R. 440-41.)  The ALJ did not discuss these records in her Decision nor are they included in the record before this Court.

dressing.  (R. 446-48.)  Plaintiff testified that she goes to church every Sunday and

Wednesday.  (R. 448.)  Plaintiff testified that she cannot do any sedentary work

because her left wrist hurts, her fingers swell up and she cannot bend over and lift

things.  (R. 448-49.)  Plaintiff testified that she stopped working in 2000 due to her neck

and right hip.  (R. 449.)  She weighs 236 pounds and previously weighed as much as

308 pounds.  (R. 451.)  Plaintiff testified that she was hospitalized for diverticulitis in

2000 but that she has no significant complications.  (R. 451-52.)   Plaintiff testified that

sitting or standing for any period of time makes her pain worse.  (R. 453.)  She testified

that she could sit for about 10 minutes before needing to change positions and walk

maybe 50 feet using a cane.  (R. 453-54.)  Plaintiff testified that she could bend and

stoop over at the waist using a cane, but it is painful; that she could pick things up off

the floor with difficulty; and that she could lift a gallon of milk with difficulty.  (R. 455-56.)

Plaintiff testified that on a daily basis her pain level is 7/10.  (R. )  She has memory loss

as a side effect from medication.  (R. 457.)  She testified that Dr. Rubin suggested that

she see a psychiatrist but she cannot afford one.  (R. 457-58.)

In his review of the record, including Plaintiff's testimony and the medical records

from several health care providers, the ALJ determined that Plaintiff has obesity,

degenerative disc disease, hypothyroidism, diabetes mellitus, and lower back pain.  (R.

11.)   However, the ALJ determined that Plaintiff did not have an impairment or

combination of impairments which met or medically equaled one of the impairments

listed in Appendix 1, Subpart P of Social Security Regulation No. 4.   (R. 14.)

The ALJ then found that Plaintiff retained the RFC to stand and walk 2 hours in

an 8-hour workday, sit 6 hours in an 8-hour workday, never climb, occasionally balance,

kneel, crouch and crawl, no reaching overhead, and limited in the upper extremity in

pushing and pulling.  (R. 14-16.)[23]    After finding that Plaintiff could perform all of her

past relevant work, the ALJ concluded that Plaintiff was not disabled. (R. 16.)   In

reaching this conclusion, the ALJ relied in part on the testimony of the vocational expert

who opined that based on the medical source statement of Dr. Jacome, Plaintiff could

perform all of her past relevant work. (Id.)

## IV. **DISCUSSION**

Plaintiff makes two arguments on appeal – i.e., that the ALJ failed to properly

consider the opinions of Dr. Bookbinder and that the ALJ failed to consider properly the

combined effects of Plaintiff's impairments.

### A.     **The ALJ properly considered the opinions of Dr. Bookbinder**

First, Plaintiff argues that the ALJ failed to properly consider the opinions of Dr.

Bookbinder.   In his November 23, 2004 Physical Medical Source Statement, Dr.

Bookbinder opined that Plaintiff could frequently and occasionally lift less than 10

pounds; stand and/or walk less than 2 hours in an 8-hour workday; and must

periodically alternate sitting and standing to relieve pain and or discomfort.  (R. 345-46.)

Dr. Bookbinder found that Plaintiff was limited in her ability to push and pull in the upper

extremities; and that she should never climb, kneel or crouch, and only occasionally

balance and crawl.   He further found that Plaintiff was limited in reaching in all

directions, handling, fingering and feeling and that she should be limited in her exposure

---

[23] Although the RFC does not include any lifting requirements, the ALJ relied on the testimony of
the vocational expert that Plaintiff could perform past relevant work based on Dr. Jacome's medical source
statement, in which he opined that Plaintiff could frequently and occasionally lift 10 pounds.  (R. 16.)

to temperature extremes, noise, dust, vibration, humidity/wetness, hazard and fumes.

However, the ALJ declined to accord Dr. Bookbinder's opinion great weight and instead, accorded the assessment of Dr. Jacome "great weight as it is consistent with the medical evidence of record when considered in its entirety and Dr. Jacome has been seeing the claimant longer and more recently." (R. 16.)  In his Medical Source Statement dated March 9, 2005, Dr. Jacome opined that Plaintiff could occasionally and frequently lift 10 pounds; stand and/or walk at least 2 hours in an 8-hour workday; and sit about 6 hours in an 8-hour workday.  (R. 361.)  He further opined that Plaintiff's pushing and/or pulling was limited in the upper extremities; she could only occasionally balance, kneel and crawl; and never climb or crouch.  (Id.)  He further found that she could not reach over her head.  (R. 362.)

Thus, Dr. Bookbinder and Dr. Jacome's most significant disagreements regard how much weight Plaintiff can lift (Dr. Bookbinder says less than ten pounds while Dr. Jacome says ten pounds ) and how long Plaintiff can sit (Dr. Bookbinder says that Plaintiff must periodically alternate sitting and standing to relieve pain and/or discomfort while Dr. Jacome says 6 hours in an 8-hour workday.)

It is well-established that substantial or considerable weight must be given to the opinion, diagnosis and medical evidence of a treating physician unless "good cause" is shown to the contrary.[24]  If a treating physician's opinion on the nature and severity of a

---

[24] Crawford v. Commissioner of Social Security, 363 F. 3d 1155, 1159 (11th Cir. 2004) (citing Lewis v. Callahan, 125 F.3d 1436, 1440 (11th Cir.1997)) ("We have found 'good cause' to exist where the doctor's opinion was not bolstered by the evidence, or where the evidence supported a contrary finding. We have also found good cause where the doctors' opinions were conclusory or inconsistent with their

(continued...)

claimant's impairments is well-supported by medically acceptable clinical and laboratory diagnostic techniques, and is not inconsistent with the other substantial evidence in the record, the ALJ must give it controlling weight.[25]   Upon a review of the ALJ's decision, as well as an examination of the medical records at issue, the Court finds that the ALJ properly considered the opinion of Dr. Bookbinder as a treating physician.  The ALJ articulated good cause for discounting Dr. Bookbinder's November 2004 Assessments (physical and mental) regarding Plaintiff's functional limitations.

As an initial matter, it should be noted that the instant case does not present a typical treating physician issue.  Indeed, this is not a situation where the ALJ rejected the opinion of a treating physician and accorded great weight to a non-examining physician.  Instead, Plaintiff essentially is arguing that the ALJ improperly weighed the medical opinions of two of Plaintiff's treating physicians – both of whom are specialists and both of whom treated Plaintiff for a similar period of time.

While the ALJ was wrong when she stated that Dr. Jacome had "been seeing the claimant longer and more recently" the number of visits and length of visits to Dr. Bookbinder and Jacome were very similar. Dr. Bookbinder saw the Plaintiff on at least six visits over a nineteen month period from July 20, 2004 to February 16, 2006.  (R. 349, 352, 354-55, 358, 422, 423.)  Over this period, Dr. Bookbinder reviewed the results of x-rays of Plaintiff's right knee and right hip and MRIs and prescribed various

---

(...continued)
medical records.").  See also Edwards v. Sullivan, 937 F.2d 580, 583-584 (11th Cir. 1991); Sabo v. Commissioner of Social Security, 955 F. Supp. 1456, 1462 (M.D. Fla.1996); 20 C.F.R. § 404.1527(d).

[25] 20 C.F.R. § 404.1527(d)(2).

medications and physical therapy.   Likewise, Plaintiff saw Dr. Jacome on at least six

occasions over a 20 month period from September 18, 2003 to May 10, 2005.  (R. 374,

375, 376-77, 364, 365, 367.)  Over the course of treatment, Dr. Jacome reviewed the

results of nerve conduction studies, electromyography, and two MRIs of the cervical and

lumbar spine, prescribed various medications and administered botox therapy.

Moreover, despite his opinion that Plaintiff had significant functional limitations, Dr.

Bookbinder's treatment reports show that Plaintiff was treated conservatively with

medication, physical therapy, and home exercise.  (R. 341-55.)[26]  In July 2004, Dr.

Bookbinder began treating Plaintiff for osteoarthritis, cervical spondylosis, possible

carpal tunnel and likely fibromyalgia (R. 354) and by September 2004, Plaintiff was

making progress and was not depressed. (R. 352.)[27]  On October 20, 2004, Dr.

Bookbinder noted that Plaintiff was improving but that she was having some sleep

interruptions; that her pain medication was working and that she had occasional

headaches but that a recent MRI of her brain was normal.  (R. 349.)   Knee x-rays

showed only moderate degenerative and other changes – stage II osteoarthritis in the

right knee and stage I osteoarthritis in the left knee.  (R. 350-51.)   On November 23,

2004, Dr. Bookbinder completed the Medical Source Statements at issue here.

Subsequent treatment reports show that on January 21, 2005 that Plaintiff had

intermittent pain in her osteoarthritic right hip and maybe some overlapping radicular

pain but "none of it too severe.  (R. 358.)  Dr. Bookbinder noted that Plaintiff's pain

---

[26] Wolfe v. Chater, 86 F.3d 1072 (11th Cir. 1995)(conservative treatment will provide substantial evidence to support an ALJ's finding of not disabled.)

[27] Dr. Bookbinder's overall impression included fibromyalgia with depression, although he specifically noted that "[s]he is not depressed ."  (R. 352.)

medications were working.  Plaintiff was negative *inter alia* for fatigue, sleep

disturbance, depression, muscle weakness, and muscle pain and on physical

examination, Plaintiff showed mild pain with internal and external rotation of the right hip

and crepitations of the right knee.  On May 5, 2005, Plaintiff reported intermittent pain in

her left shoulder and Dr. Bookbinder noted that Plaintiff had just started a new

medication (Relafen) and that it would take a week to see if it was going to work.  (R.

341.)   On November 3, 2005, Plaintiff still had a little difficulty sleeping but medication

was helping.  (R. 423.)  Plaintiff reported a "little bit" of lumbar radicular pain, a "few

minor" trigger points, and "some pain" in the left ulnar styloid of her hand that Dr.

Bookbinder attributed to tendinitis and using her arms for weightbearing.   Dr.

Bookbinder told Plaintiff to work on straight leg raising exercises and continue with

aquatic exercise.  The last treatment report from Dr. Bookbinder was on February 16,

2006.  (R. 422.)   Plaintiff reported "some diffuse" pain in her right hand and "some" pain

in her shoulder.  Dr. Bookbinder noted that Plaintiff had some osteoarthritis in her neck

and areas of possible nerve root compression noted on MRI.  On physical examination,

he found no clear evidence for an underlying systemic inflammatory disorder and he

switched her medication because he presumed the pain was either neuropathic pain or

fibromyalgia.  (R. 422.)  Given these consistently benign findings and treatment

modalities, the ALJ properly discounted Dr. Bookbinder's opinions regarding Plaintiff's

functional limitations.

　　　　Nevertheless, Plaintiff argues that the ALJ should have accorded greater weight

to the opinion of Dr. Bookbinder because his opinion was based on "a more

comprehensive" evaluation of Plaintiff's impairments than Dr. Jacome who was "more

narrowly focused" on Plaintiff's neurological symptoms. (R. 9-10.)   However, the ALJ weighed the opinions of two of Plaintiff's treating physicians (both of whom were specialists and both of whom treated Plaintiff for a similar period of time) and decided to accord greater weight to the opinion of Plaintiff's neurologist, Dr. Jacome as opposed to the opinion of Plaintiff's rheumatologist, Dr. Bookbinder.   As discussed above, this decision was supported by substantial record evidence.  It is not the role of this Court to re-weigh the evidence or substitute its discretion for that of the ALJ.[28]

Dr. Bookbinder also completed a mental Medical Source Statement which the ALJ accorded little weight because Dr. Bookbinder is a rheumatologist and not a mental health professional.  (R. 15.)  This finding is both reasonable and logical.  However, even if Dr. Bookbinder was qualified to address Plaintiff's mental limitations, his treatment records (as discussed above) do not support his opinion that Plaintiff's ability to complete a normal workday or workweek and to perform at consistent pace was poor. Indeed, prior to completing the mental Medical Source Statement on November 23, 2004, Dr. Bookbinder noted on only one occasion that Plaintiff had fibromyalgia with depression; and in that same treatment note he specifically stated that "[s]he is not depressed though her husband says she gets weepy a little bit more but most of it is because of frustration with her right hip." (R. 352.)   Accordingly, the ALJ properly discounted Dr. Bookbinder's opinions regarding Plaintiff's mental limitations.

---

[28] Wolfe v. Chater, 86 F.3d 1072, 1076 (11th Cir. 1996.)

### B. The ALJ properly considered the combined
### effects of Plaintiff's impairments

Second,  Plaintiff contends that the ALJ failed to properly consider the combined

effects of all of Plaintiff's impairments – specifically, depression and fibromyalgia.  It is

well-settled that the ALJ must consider the combined effects of Plaintiff's impairments in

determining whether she is disabled.[29]  It is the ALJ's duty "to make specific and well-

articulated findings as to the effect of the combination of impairments and to decide

whether the combined impairments cause the claimant to be disabled."

 That the ALJ did not identify depression and fibromyalgia as severe impairments

at step 2, does not mean that the ALJ failed to consider these impairments in her RFC

analysis.  Indeed,  the ALJ expressly found that Plaintiff did not have "an impairment or

combination of impairments" that met or equaled a listed impairment. (R. 22, 24.) The

Eleventh Circuit has held that this finding provides sufficient evidence that the ALJ

considered the combined effect of Plaintiff's impairments.[30]

With respect to Plaintiff's depression, the ALJ found that depression was not a

severe impairment because there was no significant mental health treatment and

Plaintiff has mild restriction of activities of daily living, mild difficulty in maintaining social

functioning, mild difficulties in maintaining concentration, persistence or pace and no

episodes of decompensation.  (R. 11.)   This finding was supported by substantial

record evidence.  A review of the record shows that Plaintiff has no history of mental

---

[29] Walker v. Bowen, 826 F.2d 996, 1001 (11th Cir. 1987).

[30] See Doc. 18 at 18 (quoting Jones v. Department of Health and Human Services, 941 F.2d 1529,
1533 (11th Cir. 1991.))

21

health treatment and there are very few references to her depression in the medical records before the Court.  Dr. Bookbinder, a rheumatologist, diagnosed Plaintiff with "fibromyalgia with depression", but he specifically noted that Plaintiff was not depressed in his treatment notes the same day.  (R. 352.)   Additionally, on December 15, 2005, Dr. Rubin, a neurologist, noted that Plaintiff had depression and that she "cries easily 'over minor things'" but by February 8, 2006, Dr. Rubin noted that Plaintiff's depression was doing better and that she was seeing her pastor for counseling.  (R. 425.)   Finally, Plaintiff testified that Dr. Ruben suggested that she see a psychiatrist but that she could not afford one.  (R. 457-58.)

The ALJ did not make a specific finding regarding fibromyalgia.  However, she discussed at great length the treatment notes of Dr. Bookbinder, Plaintiff's treating rheumatologist and considered Plaintiff's testimony regarding pain.   Accordingly, the Court cannot say that the ALJ failed to consider the effects of fibromyalgia.

Moreover, a finding of disability hinges not on the name of a condition, but on the functional limitations resulting from it that prevent the individual from engaging in any work available in the national or regional economy.  Here, Plaintiff has failed to identify any specific functional limitations resulting from her depression or fibromyalgia that were not incorporated into the ALJ's RFC assessment.[31]   Accordingly, the ALJ properly considered the combined effects of Plaintiff's impairments.

---

[31] As discussed above, the ALJ properly discounted Dr. Bookbinder's opinions regarding Plaintiff's mental and physical limitations.

22

## V. <u>CONCLUSION</u>

In view of the foregoing, the decision of the Commissioner is due to be

**AFFIRMED.**  The Clerk is directed to enter final judgment consistent with this Order and

to close the file.

**IT IS SO ORDERED.**

**DONE AND ORDERED** in Ocala, Florida, on September 29, 2008.

GARY R. JONES
United States Magistrate Judge

Copies to:
All Counsel

23